LINCOLN GRAIN, INC., A KANSAS CORPORATION, APPELLANT, V. COOPERS & LYBRAND, A PARTNERSHIP, APPELLEE.

338 N.W.2d 594

Filed September 23, 1983. No. 82-473.

Karen B. Flowers of Bauer, Galter & Geier, for appellant.

Maureen E. McGrath of Kutak Rock & Huie, and Joseph A. Clark III, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

SHANAHAN, J.

On February 24, 1977, Lincoln Grain, Inc. (Lincoln), sued its accountants, Coopers & Lybrand (C & L), for malpractice in rendering audits for fiscal periods ending in 1973, 1974, and 1975. In a trial pursuant to Neb. Rev. Stat. § 25-221 (Reissue 1979), the District Court held that the 2-year statute of limitations of Neb. Rev. Stat. § 25-222 (Reissue 1979) barred Lincoln's claims against C & L regarding 1973 and 1974, and dismissed Lincoln's action for those years. The District Court also concluded that any cause of action for 1975's audit was filed within time. Lincoln has appealed from the trial court's order of dismissal. We affirm.

Lincoln, through its Des Moines office called the "Iowa division," dealt in grain contracts. The Iowa division was a "track office"—an operation for buying grain on contract and selling the contracted grain to processors and exporters. A track office has no physical inventory of grain and never takes possession of the contracted grain.

All original contracts of the Iowa division were kept in Des Moines. Each contract was numbered and indicated the customer, date of shipment, quantity of grain under contract, destination, freight rate, and market price of the grain. At the end of

each month the manager of the Iowa division prepared a list of "open contracts"—transactions where grain had not been settled by delivery and payment as contracted. By this list Lincoln determined whether there was a gain or loss on its contracts, and the result of such computation constituted the "inventory" of the Iowa division. Each of Lincoln's divisions sent its financial statement to Lincoln's main office. These financial statements were then combined into a "yearend" consolidated financial report called a consolidated statement. A consolidated statement reflected only the inventories at the end of the last month of a period to be audited. Lincoln gave its consolidated financial statement to outside auditors, because Lincoln did not have any "internal audit staff." Accountants then conducted an audit based on the consolidated financial statement supplied by Lincoln. For each audit Lincoln's officers also supplied a certification of the divisions' inventories existing on the last day of the period to be audited.

In 1970 Lincoln contacted C & L regarding an audit in 1971. Before any audit was undertaken, C & L required an "engagement letter" which defined the "scope of the audit"—the nature and extent of the work to be done, including validation of information contained in the financial statement supplied by Lincoln, and the amount of the fee for the services to be rendered by the accountant. Without a letter of engagement C & L would not be retained for an audit. Pursuant to separate engagement letters, C & L was hired for audits from 1971 to 1975. During that time and based on information supplied by Lincoln, C & L audited fiscal periods ending on March 31 and June 30 in 1973 and on June 30 in 1974 and 1975, respectively. C & L delivered to Lincoln a written report regarding each of the three audits before 1975, namely, a report delivered on June 29, 1973, for the period ending March 31, 1973; on October 23, 1973, for the period ending June 30, 1973; and on Septem-

ber 27, 1974, for the period ending June 30, 1974.

Late in 1975 Lincoln knew there was some problem involving its Iowa division. Lincoln learned in January 1976 that the financial statements from the Iowa division were inaccurate. In early February 1976 Lincoln estimated its loss from the Iowa division to be at least $432,000. In his letter of resignation on February 6, the manager of the Iowa division acknowledged that the financial reports which he had submitted were inaccurate. On February 18 the treasurer of Lincoln wrote C & L that there was an "overstatement" of the Iowa division's inventory.

In March 1976 Lincoln sent two employees— Ardean Arndt, Lincoln's secretary, and Loyal Steube, a company accountant—to Des Moines to ascertain the reasons behind the inaccurate financial reports from the Iowa division. Lincoln's employees found out that the manager of the Iowa division had altered and misrepresented the number of bushels on the list of open contracts reported to Lincoln and had used the most favorable market price available rather than the true market price applicable to the open contract. In this manner the inventory had been "overstated" and the value of grain subject to contract had been inflated. Lincoln compared the original contracts with the list of open contracts and contacted some buyers for confirmation and validation of the transactions indicated by the contracts. Personnel from Lincoln and C & L attempted to determine the exact extent of the loss attributable to the Iowa division.

Lincoln filed suit on February 24, 1977, and alleged that C & L had not followed proper accounting procedures; that C & L's validation and testing procedure for inventories failed to disclose the distortions and overstatement by the manager of the Iowa division; that such distortion and overstatement misrepresented that the Iowa division was operating at a profit, whereas there were substantial losses during the periods audited; and that proper account-

ing methods and validation of the inventory would have disclosed the losses in sufficient time to rectify the situation without any further loss. To summarize and paraphrase Lincoln's allegations, C & L was negligent in failing to discover and report the misrepresentations regarding operations of the Iowa division.

At the trial on the question of the statute of limitations, Lincoln called an expert witness, Gerald Grant, a certified public accountant. Grant testified that a "continuous engagement" was a "formal engagement for which an auditor is engaged for several fiscal years in a single contract," but acknowledged there was no documentation that C & L's accounting relationship with Lincoln was for more than 1 year. Also, Grant testified that nothing in the relationship indicated the "engagement was other than" for the particular fiscal year designated and that there was a separate report for each of the audited periods. Grant admitted that each report "would stand on its own" and that delivery of the report ends the auditor's work on the fiscal year audited. According to Grant, an auditor has no obligation to make any further inquiry or to perform any additional auditing procedures regarding audited financial statements covered by the report, "unless new matter comes to his attention."

Lynne Sieverling, a partner in C & L, testified that during the periods audited Lincoln acquired new divisions and new subsidiaries so that the "audit work was not exactly the same from year to year."

The statute of limitations applicable to claims for malpractice is § 25-222: "Any action to recover damages based on alleged professional negligence or upon alleged breach of warranty in rendering or failure to render professional services shall be commenced within two years next after the alleged act or omission in rendering or failure to render professional services providing the basis for such action . . . ."

Lincoln contends that there is a continuity of relationship with C & L which tolls the statute of limitations for commencement of an action based on negligence in rendering the audit reports. C & L maintains that the statute of limitations commenced to run upon delivery of the audit reports in 1973 and 1974, respectively.

"The traditional rule is that the statute begins to run as soon as the action accrues, and the cause is said to accrue when the aggrieved party has the right to institute and maintain a suit. In a contract action this means as soon as breach occurs, and in tort, as soon as the act or omission occurs." *Grand Island School Dist. #2 v. Celotex Corp.*, 203 Neb. 559, 562-63, 279 N.W.2d 603, 606 (1979).

Because the lawsuit was filed more than 2 years after delivery of the audit reports or financial statements for 1973 and 1974, Lincoln advocates adoption of rules applicable to actions for medical malpractice, i.e., the statute of limitations does not commence to run until the treatment ends. See *Williams v. Elias*, 140 Neb. 656, 1 N.W.2d 121 (1941). The conclusion of the treatment, Lincoln suggests, should be governed by the doctrine of "continuous treatment" expressed in *Borgia v. City of New York*, 12 N.Y.2d 151, 155, 157, 237 N.Y.S.2d 319, 321-22 (1962), "[W]hen the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint, the 'accrual' comes only at the end of the treatment. . . . The 'continuous treatment' we mean is treatment for the same or related illnesses or injuries, continuing after the alleged acts of malpractice, not mere continuity of a general physician-patient relationship."

If the doctrine of continuous treatment is to be applied in this case, we must answer a basic question: Was there a continuous relationship between Lincoln and C & L?

C & L rendered services only after Lincoln ac-

cepted the terms of the engagement letter. An engagement letter was indispensable for each of the audits rendered by C & L. Pursuant to each engagement letter, C & L compiled information in the form of noncumulative financial statements or audit reports. This information included the inventory of the Iowa division. The inventory consisted of contracts existing at a given date. These contracts pertained only to a specific fiscal period and were not related to any other interval before or after a current fiscal period to be audited. The inventory existing at the last day of the period audited was neither a factor nor an ingredient of any other audit. Lincoln's inventory, therefore, began anew on the first day of a subsequent fiscal period.

In *Tool v. Boutelle*, 91 Misc. 2d 464, 398 N.Y.S.2d 128 (1977), which was an action for the malpractice of an engineer-surveyor, there was a characterization of "continuous treatment": "[T]he 'continuous treatment' must be a treatment for the same or related condition, continuing after the alleged acts of malpractice; not mere continuity of a general professional relationship . . . . But 'relation' is not the only element which must be found in order for the doctrine to apply; there must also be 'continuity' . . . ." 398 N.Y.S.2d at 130.

"Continuity" means "being continuous . . . state of continuing without essential change." Webster's Third New International Dictionary, Unabridged, 493 (1968). "Continuous" means "stretching on without break or interruption." *Id*. at 494.

Because the inventory peculiar to a track office changed essentially from day to day without connection with any other inventory, past, present, or future, the continuity required for "continuous treatment" is nullified. The subject matter of each audit ceased to exist beyond the last day of the fiscal period being audited. The "condition" was never identical for any two audits rendered by C & L. Any audit by C & L did not refer to any prior audit, was

not based on any information contained in a previous audit, did not incorporate or expand any previous audit, and was not carried forward in any form into any subsequent audit. As admitted by Lincoln's witness, each report "would stand on its own." Each audit was a separate, independent and unrelated transaction or occurrence. Consequently, in the present case the doctrine of "continuous treatment" is not available to suspend the time limit prescribed for the commencement of an action for professional negligence. See *Naetzker v. Brocton Schl. Dist.*, 50 A.D.2d 142, 376 N.Y.S.2d 300 (1975).

Under the circumstances of this case the statute of limitations commenced to run when C & L delivered the audit reports or financial statements to Lincoln. See, *Carr v. Lipshie*, 8 A.D.2d 330, 187 N.Y.S.2d 564 (1959); *Owyhee County v. Rife*, 100 Idaho 91, 593 P.2d 995 (1979); *Alexander & Baldwin, Inc. v. Peat, Marwick, M. & Co.*, 385 F. Supp. 230 (S.D. N.Y. 1974); *Wasserman v. Herwood*, 36 Misc. 2d 522, 232 N.Y.S.2d 730 (1962).

Because suit was not filed within 2 years after Lincoln's receipt of the audit reports in 1973 and 1974, any claims which Lincoln may have had for malpractice in C & L's rendering of those audit reports are barred. The District Court was correct in dismissing the action of Lincoln concerning the years 1973 and 1974, and, therefore, the judgment of the District Court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., and MCCOWN, J., not participating.