WORLD RADIO LABORATORIES, INC., A NEBRASKA CORPORATION, APPELLEE, V. COOPERS & LYBRAND, A PARTNERSHIP, APPELLANT.

557 N.W.2d 1

Filed December 13, 1996.   No. S-93-739.

Philip A. Lacovara and Lynne M. Raimondo, of Mayer, Brown & Platt; Jeff A. Anderson, of Kutak Rock; William G. Campbell, of Rogers & Wells; and Maureen E. McGrath for appellant.

Joseph E. Jones, Michael L. Schleich, and Lon A. Licata, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

PER CURIAM.

On May 20, 1986, World Radio Laboratories, Inc., brought an accounting malpractice action against Coopers & Lybrand. In its petition, World Radio claimed that Coopers & Lybrand negligently prepared World Radio's financial statements for fiscal years 1981 through 1984 and negligently failed to advise World Radio as to the inadequacy of its internal accounting controls.

The jury entered a verdict for World Radio and awarded damages of $0 for 1981, $10,300 for 1982, $12,000 for 1983, and $17,018,000 for 1984. Coopers & Lybrand filed a timely appeal. The Nebraska Court of Appeals affirmed the verdict of liability on the part of Coopers & Lybrand but concluded that the evidence was insufficient to support a damage award based on lost profits or a decrease in the value of World Radio. Concluding that the evidence did support an award for accounting expenses incurred to both Coopers & Lybrand and the successor accounting firm, Arthur Young, the court remanded the cause for determination of those fees. The court also held that

the statute of limitations and the doctrine of contributory negligence did not bar recovery by World Radio. *World Radio Labs. v. Coopers & Lybrand*, 4 Neb. App. 34, 538 N.W.2d 501 (1995).

The Court of Appeals subsequently modified its opinion and held that World Radio failed to bring its negligence action for 1983 within the 2-year period prescribed by Neb. Rev. Stat. § 25-222 (Reissue 1995). Therefore, the court held, World Radio was prohibited from recovering any damages incurred for 1983. *World Radio Labs. v. Coopers & Lybrand*, 4 Neb. App. 264, 542 N.W.2d 78 (1996).

Both Coopers & Lybrand and World Radio have petitioned this court for further review. We agree with the Court of Appeals' determination that Coopers & Lybrand was negligent in auditing World Radio for the years in question and that the evidence is insufficient as a matter of law to sustain a damage award for lost profits or a decrease in World Radio's value. We also agree with that portion of the court's opinion remanding this cause for a determination of fees paid to Arthur Young as a result of Coopers & Lybrand's negligence. However, we modify that portion of the court's opinion remanding this cause for a determination of the fees paid to Coopers & Lybrand for negligent work insofar as we determine the amount of those damages to be set at $42,000.

## I. ASSIGNMENTS OF ERROR

On petition for further review, Coopers & Lybrand assigns numerous errors. In summary, Coopers & Lybrand argues that the trial court erred by (1) failing to grant Coopers & Lybrand's motion for a directed verdict on World Radio's claim that its alleged negligence caused World Radio's damages, (2) failing to grant Coopers & Lybrand's motion for a directed verdict on the issue of damages, and (3) failing to grant Coopers & Lybrand judgment on the issue of whether the statute of limitations barred recovery for 1981, 1982, and 1983.

In addition, Coopers & Lybrand argues that the Court of Appeals erred by (1) affirming liability for accounting malpractice on the theory that the negligent acts of World Radio's chief financial officer could not be attributed to World Radio; (2) failing to grant Coopers & Lybrand's motions for directed verdict

and judgment notwithstanding the verdict, considering that the evidence offered to prove causation and damages was insufficient; and (3) remanding the cause for retrial on the issue of damages instead of reducing damages to the amount of the auditing fees.

In its petition for further review, World Radio also assigns numerous errors. In summary, World Radio argues that the Court of Appeals erred by (1) ruling that World Radio's experts were insufficient as a matter of law, (2) disregarding precedent as to the issue of to what degree of certainty World Radio was required to prove its damages, (3) improperly instructing the jury on World Radio's theory of damages, and (4) improperly overruling the district court's decision that the statute of limitations did not bar World Radio's claims for 1983.

## II. BACKGROUND

### 1. WORLD RADIO IN 1935 THROUGH 1979

World Radio was founded in 1935 when Leo Meyerson began selling radio parts out of his car to amateur and ham radio operators. After a brief interruption during World War II, World Radio reopened and began selling radio equipment and associated electronics by mail order on a worldwide basis.

Leo Meyerson's son, Larry (Meyerson), joined the company in 1961. With the addition of Meyerson, World Radio quickly responded to the changing trends in the radio market. It was Meyerson that decided to enter the retail consumer electronic business by opening a retail store in Omaha, Nebraska, in 1967. In addition to selling radio equipment, this store also specialized in records, tapes, and stereo equipment.

The retail operations of World Radio expanded steadily throughout the 1970's. Selling mostly stereo and hi-fi equipment, World Radio increased its sales from $1.4 million in 1971 to over $7 million in 1979. By 1979, World Radio was operating 10 retail stores in two states.

In response to this rapid growth, Meyerson, as president and majority shareholder, sought to "professionalize" the company by hiring new management members. One such member was Joseph Riha, a certified public accountant and former auditor with Coopers & Lybrand. Hired in 1979, Riha served as World

Radio's chief financial officer and remained in charge of the accounting department until June 1985.

## 2. WORLD RADIO IN 1980 THROUGH 1985

The success of World Radio continued into the early 1980's. Once again responding to changes in industry trends, the company expanded into television and video retail. This expansion proved to be quite successful, as evidenced by sales of $10,955,186 and $19,187,170 in 1982 and 1983, respectively. In addition, the number of retail stores in 1984 had increased to 24, with sales in that year totaling $34,223,889. It was Meyerson's goal, as president of World Radio, to have 50 stores in operation by 1987.

In light of this success, Meyerson dreamed of "going public," whereby shares of World Radio stock would be sold to the public. The funds raised by a public offering of World Radio stock would be used to help the company grow further. Meyerson discussed this "dream" with his auditors, Coopers & Lybrand, in 1983. While Coopers & Lybrand accountants advised Meyerson that such an offering could not be made until World Radio acquired $2 million in net profits, Meyerson remained hopeful because World Radio was expected to reap profits in the amount of $2 million by 1985. Despite his initial enthusiasm, Meyerson never drew up formal plans for a public offering or took any other steps in furtherance of his dream.

One of Riha's first projects upon being hired as chief financial officer was the installment of a "sophisticated" computer system. Upon installation of this new system, World Radio's cash registers at each retail location were tied to a mainframe in the company's Council Bluffs, Iowa, headquarters. As a result, the system automatically recorded every sale that took place at each store. Once these were recorded, the computer system would generate a gross margin report that showed each item sold, the cost of merchandise sold, and the gross margin realized. Total figures of the gross margin for the sales of each store were then produced on a daily basis. This information was then interfaced with the general ledger in the computer to show the overall gross margin figures for the entire company. The system was also designed to offset all financial statements by the

amount of World Radio's outstanding debts or accounts payable.

World Radio often financed inventory purchases. Due to the large amount of inventory World Radio was purchasing during the early 1980's, the company often financed its inventory from outside sources using a "floor plan." Under this approach, World Radio would enter into an agreement with a finance company whereby any goods purchased from a supplier would be delivered to World Radio but charged to the finance company. The finance company would pay the supplier, receiving a cash discount. World Radio would then pay the finance company according to the terms provided in the agreement between the parties. By using such a plan, World Radio received goods at a cheaper rate than if purchased directly from the supplier.

In January 1984, World Radio floor planned its inventory and entered into an unsecured inventory agreement with Westinghouse Credit Corporation (Westinghouse). Under this agreement, Westinghouse paid World Radio's suppliers for purchased inventory, and Westinghouse, not World Radio, received the cash discount offered by the supplier. Westinghouse then billed World Radio for the full purchase price, to be paid in three equal installments.

Due to the use of installment payments, Riha claimed World Radio's sophisticated computer system could not keep track of the debt owed to Westinghouse. Thus, World Radio kept track of the Westinghouse account payable in a rudimentary fashion, by simply putting the unpaid invoices in a special drawer in an accounting clerk's desk. An accounting clerk would then manually keep track of the payment dates and prepare a check payable to Westinghouse. This check would then be signed by Meyerson or Riha.

Unlike other accounts payable, the Westinghouse payable was never entered into the computer system. Instead, the debt would be reflected only if it were manually added to the balance sheet generated by the computer. However, this was never done. This omission resulted in incorrect financial statements which showed liabilities to be too low and the profits for each year to be too high by the amount of the Westinghouse payable. Because the unrecorded Westinghouse payable was $890,111 as

of June 2, 1984, World Radio's financial statements, as generated by the computer system, were extremely inaccurate.

Coopers & Lybrand, World Radio's independent accountants and auditors since 1970, failed to locate the missing Westinghouse payable. It was not until May 21, 1985, that Riha discovered that the June 2, 1984, audited financial statements may not have included the outstanding debt owed to Westinghouse. Upon making this discovery, Riha immediately informed Meyerson, who, shortly thereafter, terminated Riha and extinguished all relations between World Radio and Coopers & Lybrand.

Meyerson then engaged Arthur Young, another national accounting firm, to audit World Radio's financial records as of June 1, 1985. In addition to the missing Westinghouse payable, Arthur Young discovered material weaknesses in World Radio's system of internal accounting controls. As a result, Arthur Young was unable to prepare an income statement or other financial statements for the fiscal year ending June 1, 1985.

The particular weaknesses discovered by Arthur Young were formally relayed to World Radio stockholders in a letter dated March 10, 1986. In this letter, Arthur Young stated that World Radio's accounting system in place on June 1, 1985, and for several years prior thereto, was inadequate because it failed to protect assets and to ensure that transactions had been authorized. In addition, Arthur Young concluded that the financial statements prepared under the system did not adhere to generally accepted accounting principles.

Stanley Scott, a certified public accountant, testified that an auditor has a duty to advise a company of any deficiencies in its accounting system. According to Scott, a failure to discover a material deficiency would affect a company's financial statements. In Scott's opinion, the failure to discover deficiencies present in World Radio's internal accounting controls was a result of Coopers & Lybrand's failure to follow generally accepted accounting principles.

At trial, World Radio offered evidence that Arthur Young's inability to prepare financial statements created problems. For instance, World Radio's relationship with its primary lender, Omaha National Bank, changed dramatically. During 1983,

World Radio's credit line with the bank was increased from $600,000 to $1.2 million and in 1984 from $1.2 million to $3 million. Without a financial statement in 1985, however, the bank refused to increase World Radio's credit line to allow for further expansion. In fact, Meyerson was forced to sign a personal guarantee with the bank to keep World Radio's revolving credit line.

Meyerson and Luke Northwall, the successor to Riha as chief financial officer, testified that the lack of financial statements also prevented World Radio from purchasing new products and inventory lines, because new suppliers would not sell products and open new credit lines to a company without financial statements. Northwall also opined that World Radio's accounting system prior to June 1, 1985, was insufficient in that it did not prevent employee theft or protect company assets. Furthermore, in Northwall's view, the lack of financial statements resulted in World Radio's experiencing problems with funds, advertising, and layaway and loaner policies.

Malcolm Ballinger, World Radio's vice president of merchandising, testified that the inability to purchase new product lines in 1985 was especially damaging because the technology in television and video was changing dramatically during this period.

According to Meyerson, the lack of financial statements also prevented the opening of any new stores, because landlords would not be willing to negotiate without such statements. Meyerson also stated that had Coopers & Lybrand informed him that better accounting controls were needed, he would have incorporated them "immediately," and that had he known of the missing Westinghouse payable, he would not have paid substantial employee bonuses or made profit-sharing contributions. In Meyerson's words, World Radio "made decisions all the time based on what we believed to be accurate financial statements."

### 3. WORLD RADIO IN 1985 THROUGH 1989

Since World Radio had no financial statements, Northwall initiated a "survival plan" to keep World Radio operating through the 1985 Christmas season. This plan called for the liquidation and overall reduction of inventory, including the carry-

ing of fewer items in the product line. The conversion of inventory into cash would provide the needed funds to operate the company. Northwall testified that this generation of operating cash necessarily reduced sales.

In addition to reducing inventory, World Radio also changed its fiscal year to end in February 1986, rather than June 1986. As such, financial statements were prepared for a "stub year," representing the 36-week period of June 2, 1985, through February 1, 1986. World Radio opted for this approach because it would be too expensive to have Arthur Young reconstruct the records and prepare an income statement for 1985. According to Northwall, the creation of these short-term financial statements was necessary for World Radio's survival.

The income statement generated for the stub period showed a net income of $1,224,663, with equity increasing to $934,482. These figures differ drastically from the balance sheet prepared by Arthur Young in March 1986, which showed World Radio as having a negative worth of $248,164 as of June 1, 1985. With a positive net income statement for the stub year, World Radio was once again able to represent to the bank and other creditors its ability to make profits.

Despite previous problems, World Radio remained in business after discovering the missing Westinghouse payable and inadequate accounting controls. The evidence adduced at trial showed that World Radio's creditors continued to do business with World Radio. In response to the newly prepared financial statements for the stub year, the bank was once again willing to increase World Radio's credit line. World Radio continued to expand its business operations by opening seven new stores in 1986 and 1987. Throughout this time period, World Radio was also engaging in several new markets.

The accounting firm of Peat Marwick prepared World Radio's audit report for the fiscal year ending January 31, 1987. According to this report, World Radio had earned a net income of $1,229,782 during the 1986 fiscal year. During the same period, World Radio's equity rose to $2,157,594, an increase of more than $2 million over the negative equity shown on World Radio's June 1, 1985, balance sheet prepared by Arthur Young. Gross sales for the 1987 fiscal year were $40,562,746.

This upward swing came to a halt in 1988. An audit report prepared for the fiscal year ending January 31, 1988, showed that World Radio had incurred a loss of $1,529,659, with a decrease in its equity to $346,809. In March 1988, World Radio stock owned by Meyerson was redeemed, and Ballinger and Northwall became the owners of World Radio. Ballinger and Northwall continued to operate World Radio for another year until operations were ceased on March 29, 1989, when World Radio filed bankruptcy.

### 4. EVIDENCE OF WORLD RADIO'S DAMAGES

World Radio filed its original petition against Coopers & Lybrand for professional malpractice on May 20, 1986. The petition was later amended, on February 25, 1987. Pursuant to its amended petition, World Radio alleged damages in the following particulars: inability to obtain or raise equity capital for expansion; inability to expand its business by opening new stores and increasing credit lines; the making of operating decisions based on false financial information; inability to conduct normal business operations; lost revenues; lost discounts, rebates, and advertising allowances and participation; inventory losses; decrease in employee morale; attorney, accounting, and polygraph fees; overtime expenses; entering into business dealings it would not otherwise have entered into; granting of benefits and bonuses it would not otherwise have given; decrease in the value of the company; and inadequate capital to operate its business as configured. World Radio concluded its petition by requesting a judgment against Coopers & Lybrand in the amount of $18,151,945.

At trial, World Radio relied upon the testimony of Northwall and Laurie Shahon, an investment banker in New York, as well as exhibit 180, to establish the nature and scope of these damages. In particular, World Radio claimed that Coopers & Lybrand's negligence caused World Radio to lose profits and drastically decreased the value of the company.

### (a) Exhibit 180 and Lost Profits

Exhibit 180 represents Northwall's calculations of what World Radio's profits would have been between 1981 and 1985

if proper internal accounting controls had been employed by Coopers & Lybrand. In arriving at these figures, Northwall examined World Radio financial statements prepared after the internal control problems had been fixed. In particular, Northwall considered the balance sheet prepared by Arthur Young for June 1, 1985; the earnings statement for the stub year (June 2, 1985, through February 1, 1986); and the earnings statement prepared by Peat Marwick for the fiscal year ending January 31, 1987. Northwall then determined the percentage of expenses to gross sales during this period (hereafter, 1986-87 period).

Using the computer-generated gross margin reports, Northwall determined the baseline or actual profit figures for 1981 through 1985. These profit figures were adjusted to reflect the same profitability ratio of the 1986-87 period. To obtain these figures, Northwall took World Radio's actual revenue and cost figures for 1981 through 1985 (as reflected in the gross margin reports) and increased them according to the ratio of expenses to gross sales of World Radio during the 1986-87 period. In so doing, Northwall assumed that the direct operating expenses and various costs, expenses, and rebates for each year would be the same percentage of gross sales. Northwall then added the net-income-after-taxes figure for each year to the stockholders' equity as shown on World Radio's May 31, 1980, balance sheet prepared by Coopers & Lybrand. By this method, Northwall determined what he believed to be the stockholders' equity in World Radio at the end of each fiscal year from 1982 through 1985.

#### (b) Shahon's Testimony on Loss of Value

In addition to exhibit 180 and Northwall's corresponding foundational testimony, World Radio also offered the testimony of Shahon. Having considerable experience in dealing with electronic retail businesses "going public," Shahon testified as to the value of World Radio as of June 1985.

Before arriving at her opinion of World Radio's value in June 1985, Shahon first examined information on seven consumer electronics companies that had "gone public." Shahon determined that five of these seven companies were relevant to a

determination of the price/earnings ratios of World Radio. A price/earnings ratio represents the price a company is selling for in the marketplace divided by its earnings per share. In other words, the marketplace value of a company can be determined by multiplying that company's price/earnings ratio by its earnings.

According to Shahon, the price/earnings ratios of the five pertinent companies for the first 5 months of 1985 varied from as high as 20.38 to as low as 11.11. For Shahon's evaluation of World Radio, she selected a narrower and more "conservative" range of price/earnings ratios of 11 to 16. Therefore, Shahon multiplied World Radio's 1985 earnings, as shown on exhibit 180, by these ratios. As such, Shahon testified that "assuming the numbers contained on Exhibit 180" had been the case, World Radio was worth between $8 million and $11 million on June 1, 1985. Shahon also testified that World Radio's negative actual worth of $248,164, as disclosed by its June 1, 1985, balance sheet, made World Radio "virtually worthless."

In addition to evidence on the issues of lost profits and loss of value, evidence was also presented showing that World Radio had paid Coopers & Lybrand accounting fees in the amounts of $13,000, $14,000, and $15,000 for 1982, 1983, and 1984, respectively.

### 5. JURY INSTRUCTIONS

The district court gave only two instructions on damages. Instruction No. 18 instructed the jury to "fix the amount of money which will fairly and fully compensate the plaintiff for its loss proximately caused by the alleged negligence of the defendant." The instruction went on to state that the jury verdict must be based on evidence and not on speculation, guess, or conjecture.

Instruction No. 19 dealt specifically with World Radio's claim for lost profits and stated:

> The plaintiff seeks damages in the form of lost profits by claiming that the negligent conduct of the defendant prevented its established business from earning profits. In order to do so, the plaintiff has the burden of proving by the greater weight of the evidence: (1) that it is reasonably

certain that such profits would have been realized except for the negligence, and (2) that the lost profits can be ascertained and measured from the evidence with reasonable certainty.

While lost profits need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. The evidence must show with reasonable certainty both that such damages did, in fact, occur and the extent of those damages.

## III. STANDARD OF REVIEW

A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party. *German v. Swanson*, 250 Neb. 690, 553 N.W.2d 724 (1996); *Patterson v. City of Lincoln*, 250 Neb. 382, 550 N.W.2d 650 (1996).

The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Bristol v. Rasmussen*, 249 Neb. 854, 547 N.W.2d 120 (1996).

With regard to the overruling of a motion for directed verdict made at the close of all the evidence, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, where an issue should be decided as a matter of law. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996); *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994).

## IV. ANALYSIS

### 1. STATUTE OF LIMITATIONS

At trial, the jury did not award World Radio any damages for 1981. However, the jury did award damages against Coopers & Lybrand for negligence for 1982 through 1984. Coopers & Lybrand argues that the trial court erred by failing to find that recovery by World Radio for 1982 and 1983 was barred by the statute of limitations.

The Court of Appeals, in its initial opinion, disagreed with Coopers & Lybrand and upheld the trial court's decision. Coopers & Lybrand subsequently filed a motion for rehearing following the issuance of the court's opinion. Coopers & Lybrand asked the court to reconsider whether recovery by World Radio for malpractice occurring during 1983 was barred by the statute of limitations. While the Court of Appeals overruled Coopers & Lybrand's motion, it modified its initial opinion to reflect that World Radio's claims arising out of events in 1983 were barred by the statute of limitations.

Pursuant to § 25-222, an action based on professional negligence must be brought within "two years next after the alleged act or omission in rendering or failure to render professional services." In cases involving negligently prepared audits, the statute begins to run when the audit report is delivered to the client. *Lincoln Grain v. Coopers & Lybrand*, 215 Neb. 289, 338 N.W.2d 594 (1983).

The 2-year limitation may be extended if facts constituting the basis of the malpractice action are not discovered and could not reasonably be discovered within 2 years of the alleged negligent conduct. See *Lindsay Mfg. Co. v. Universal Surety Co., supra*. Under such circumstances, § 25-222 allows a malpractice action to be brought within 1 year from the date of discovery or within 1 year from the date the plaintiff acquires facts that would lead to such discovery.

On October 5, 1982, Coopers & Lybrand mailed the audit report to World Radio for the fiscal year ending in 1982. On May 21, 1985, Riha and Meyerson discovered that the Westinghouse payable had not been considered in the 1984 audit and possibly earlier audits. Because they did not discover facts that could legitimately serve as a basis for a malpractice action within 2 years of Coopers & Lybrand's mailing of the October 5, 1982, audit report, the 1-year discovery exception applied to damages sustained in 1982. More specifically, World Radio could file its negligence action based on the 1982 audit as late as May 21, 1986. Because the action was filed on May 20, 1986, World Radio's negligence action for 1982 was not barred.

The evidence also demonstrates that Coopers & Lybrand mailed the 1983 audit report to World Radio on August 5, 1983. Because World Radio did discover facts within 2 years of Coopers & Lybrand's mailing of the audit report, World Radio was required to file its petition as to any damages incurred in 1983 by August 5, 1985. Since World Radio filed its action on May 20, 1986, its claim for malpractice arising out of the 1983 audit report was barred by the 2-year statute of limitations.

We therefore hold, as did the Court of Appeals, that the statute of limitations did not bar World Radio's action for 1982. We also affirm the Court of Appeals' modified decision and hold that the statute of limitations did bar World Radio's action for 1983.

## 2. NEGLIGENCE

In its appeal to this court, Coopers & Lybrand does not dispute the correctness of the jury's finding that it was negligent in auditing World Radio. Instead, the main thrust of Coopers & Lybrand's argument before this court is twofold: (1) that the evidence was insufficient to establish that Coopers & Lybrand's failure to discover the missing Westinghouse payable and problems with World Radio's internal control systems constituted the actual and proximate cause of the damages alleged by World Radio, and (2) that even if the issue of proximate cause was properly submitted to the jury in this case, the evidence offered by World Radio to prove its damages was speculative and conjectural as a matter of law.

As a general matter, we note that before a plaintiff may recover for accounting malpractice, the essential elements of any negligence action must be proved, namely, (1) duty, (2) breach, (3) causation, and (4) resulting damages. See *Lincoln Grain v. Coopers & Lybrand*, 216 Neb. 433, 345 N.W.2d 300 (1984). At issue in the instant case are the elements of causation and damages.

### (a) Causation

There are three basic requirements that must be met to establish causation: (1) that "but for" the defendant's negligence, the injury would not have occurred; (2) that the injury is the natu-

ral and probable result of the negligence; and (3) that there is no efficient intervening cause. *Saporta v. State*, 220 Neb. 142, 368 N.W.2d 783 (1985). Determination of causation is ordinarily a matter for the trier of fact. *Dolberg v. Paltani,* 250 Neb. 297, 549 N.W.2d 635 (1996); *Merrick v. Thomas*, 246 Neb. 658, 522 N.W.2d 402 (1994).

### (i) Failure to Discover Missing Westinghouse Payable

There was considerable evidence offered at trial that Coopers & Lybrand failed to find the missing Westinghouse payable on World Radio's financial statements. In fact, as noted above, Coopers & Lybrand does not dispute the jury's finding of negligence. What Coopers & Lybrand does dispute, however, is whether its failure to detect the missing payable caused the damage alleged by World Radio.

According to Coopers & Lybrand, it was the *existence* of the $890,111 account payable to Westinghouse that created financial difficulties for World Radio and not the *discovery* of it. In Coopers & Lybrand's view, the failure to detect the payable actually helped World Radio because it overstated World Radio's actual financial position by the amount of the payable, thereby enabling World Radio to receive credit it would not otherwise have been able to get. Coopers & Lybrand asserts that the failure to discover the missing Westinghouse payable in 1984, at most, delayed the adverse consequences of being indebted in the amount of $890,111. Coopers & Lybrand therefore contends that World Radio failed, as a matter of law, to establish the required element of proximate causation.

Coopers & Lybrand is correct in asserting that it was not responsible for the creation of the Westinghouse payable. This fact alone, however, does not mean that the failure to find the payable did not cause World Radio damage. At trial, Meyerson specifically testified that World Radio "made decisions all the time based on what we believed to be accurate financial statements." Furthermore, the evidence offered at trial shows that World Radio continued to expand and incur more debt in 1984 and 1985 believing its financial status was sound, as reported by the incorrect financial statements. Meyerson also testified that had Coopers & Lybrand discovered the missing payable earlier

and relayed this information to World Radio, World Radio would have immediately made any changes necessary in its internal accounting controls. This evidence was sufficient to allow the jury to conclude that World Radio's reliance on the incorrect financial statements prepared by Coopers & Lybrand caused World Radio to make business decisions it might not otherwise have made, thereby causing financial damage in the form of lost profits and a loss in the value of the company. For this reason, whether Coopers & Lybrand's incorrect auditing practices caused World Radio financial harm damage was a factual question for the jury. See *Lincoln Grain v. Coopers & Lybrand*, 216 Neb. 433, 345 N.W.2d 300 (1984).

### (ii) Failure to Discover Inadequate
### Internal Accounting Controls

In a similar manner, Coopers & Lybrand also argues that its failure to detect weaknesses in World Radio's internal accounting controls was not the proximate cause of World Radio's alleged damages. Coopers & Lybrand contends that it was World Radio's actual financial condition in 1984 and 1985, along with other multiple intervening causes, that led to its demise and eventual bankruptcy.

In support for its position, Coopers & Lybrand points out that World Radio rebounded from any adverse consequences flowing from the failure to discover World Radio's inadequate internal accounting controls, as evidenced by increased sales in the 1986-87 period. In addition, Coopers & Lybrand asserts that World Radio, as well as the electronics industry in general, changed dramatically in the mid to late 1980's. The evidence adduced at trial demonstrates that World Radio made significant changes in its management team after the termination of Riha. In 1984, Ballinger was hired as World Radio's vice president of merchandising. At Ballinger's request, World Radio reduced prices, increased sales commissions, and introduced an entirely new product line in the form of extended warranty contracts. Ballinger also changed World Radio's product mix from 10 percent video and 90 percent audio to 46 percent video and 54 percent audio.

At the same time, the electronics industry experienced an overall increase in competition. This increase in competition infiltrated several of World Radio's markets in Iowa and the Kansas City area. As a result, World Radio eventually closed its stores in Kansas City, suffering a loss of $575,000. In a management memorandum dated March 29, 1988, Northwall and Ballinger wrote that the fiscal losses of 1988 "can be directly attributed to operating in unprofitable markets, excessive compensation for selected employees, and disagreements over strategic plans for the future." According to Coopers & Lybrand, it was these events and occurrences, and not Coopers & Lybrand's failure to detect World Radio's inadequate internal accounting controls, that led to World Radio's financial ruin.

Concerning issues of proximate cause, we have stated that "[a] plaintiff is not bound to exclude the possibility that the [event] might have happened in some other way, but is only required to satisfy the jury, by a preponderance of the evidence, that the injury occurred in the manner claimed." *Vredeveld v. Clark*, 244 Neb. 46, 51, 504 N.W.2d 292, 296 (1993). As set out extensively in section II(2), World Radio offered evidence that Coopers & Lybrand's failure to discover World Radio's inadequate internal accounting controls prohibited Arthur Young from preparing an income statement for World Radio as of June 1, 1985. This, in turn, prohibited World Radio from obtaining credit from its bank and suppliers, resulting in World Radio's inability to purchase additional inventory and new product lines. The testimony also showed that World Radio's lack of financial statements during this period hindered its ability to open new retail locations. Ballinger testified that these problems persisted as long as World Radio was in business and that World Radio was never able to recover. Finally, World Radio presented evidence that had Coopers & Lybrand informed it of inadequate internal accounting controls at any time after 1982, those problems would have been corrected.

The issue of proximate cause, in the face of conflicting evidence, is ordinarily a question for the trier of fact. *Mid Century Ins. Co. v. City of Omaha*, 242 Neb. 126, 494 N.W.2d 320 (1992). The record before us clearly contains conflicting evidence regarding proximate causation. Whereas some evidence

and testimony indicated that World Radio's financial problems were caused by an increase in competition and bad managerial decisions, other testimony stated that Coopers & Lybrand's failure to detect the weaknesses in World Radio's internal accounting controls caused an irreparable decrease in World Radio's profits and value. Accordingly, the trial court correctly submitted the issue of proximate cause to the jury.

### (b) Damages

Our determination that the proximate cause issue was properly submitted to the jury does not end our inquiry. We must now examine the appropriateness of submitting to the jury the damage claim for lost profits and loss of value. In particular, we must determine whether World Radio's evidence concerning damages was speculative and conjectural as a matter of law.

As a general matter, the proper measure of damages in a negligence action is that which will place the aggrieved party in the position in which he or she would have been had there been no negligence. *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996); *Patterson v. Swarr, May, Smith & Anderson*, 238 Neb. 911, 473 N.W.2d 94 (1991). The nature and amount of damages cannot be sustained by evidence which is speculative and conjectural. *Bakody Homes & Dev. v. City of Omaha*, 246 Neb. 1, 516 N.W.2d 244 (1994). In addition, a plaintiff must prove damages with reasonable certainty. *Patterson v. Swarr, May, Smith & Anderson, supra.*

### (i) Lost Profits

At trial, Northwall testified as to what he thought World Radio's profits would have been had Coopers & Lybrand not been negligent in the auditing of World Radio. As noted previously, the testimony offered by World Radio in support of this contention revolved around the validity of exhibit 180. We must therefore determine the accuracy and legitimacy of exhibit 180.

In examining exhibit 180, we note that a claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness. *Evergreen Farms v. First Nat. Bank & Trust*, 250 Neb. 860, 553 N.W.2d 728 (1996). Uncertainty as to the fact of

whether damages were sustained at all is fatal to recovery, but uncertainty as to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. *Katskee v. Nevada Bob's Golf of Neb.*, 238 Neb. 654, 472 N.W.2d 372 (1991). Loss of prospective profits may be recovered if the evidence shows with reasonable certainty both its occurrence and the extent thereof. *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988).

Exhibit 180 represents Northwall's opinion as to what World Radio's profits would have been in 1981 through 1984 had proper internal accounting controls been used by Coopers & Lybrand. As noted above, Northwall's conclusions were based upon profits World Radio made during the 1986-87 period, when all internal control problems had been cured. Assuming this same profitability ratio would have been experienced in 1981 through 1984 had proper controls been in place, Northwall simply upgraded the actual profits during this time period by the expenses/gross sales percentage obtained in the 1986-87 period.

Coopers & Lybrand objected to the admission of exhibit 180 at trial and in its motion for directed verdict, alleging that there was insufficient support for the accuracy of the exhibit and that the exhibit was based on speculation and conjecture. We agree.

Northwall's estimation of lost profits relies exclusively on a comparison of World Radio's profits in 1981 through 1984 with those generated in the 1986-87 period. In making this comparison, however, Northwall failed to account for the many differences in the business between these time periods. For example, in 1986 and 1987, World Radio operated more stores in different markets and utilized greater space than it had in 1984 and 1985. In 1986 and 1987, World Radio sold a significantly different product mix (46 percent video/54 percent audio) than the product mix it promoted in 1981 through 1985 (10 percent video/90 percent audio). This increase into the video arena involved products with a greater profitability and also yielded World Radio's offer of extended warranty contracts to its customers. Furthermore, in 1986 and 1987 World Radio had a new management team with a different vision and management style

that was instrumental in negotiating a variety of revenue-producing contracts. In failing to take these significant changes into account, Northwall was, almost literally, comparing apples to oranges.

We have recently examined the requirements for recovery of lost profits, in *Evergreen Farms v. First Nat. Bank & Trust, supra.* At issue in that case was the ability of Evergreen Farms, a partnership engaged in the custom cattle feeding business, to recover damages for lost profits that resulted from its bank's refusal to loan Evergreen $100,000 pursuant to previous loan agreements. It was alleged that the failure to receive these funds prohibited Evergreen from making advance purchases of corn at a favorable market rate. This, in turn, prevented Evergreen from guaranteeing a set cost for its services, ultimately resulting in the loss of customers.

In support of the claim for lost profits, an owner of Evergreen opined that Evergreen made a net profit of 10 cents per head of cattle per day. The witness then assumed that Evergreen would have fed 2,000 head of cattle more for a 2-year period if it had been able to guarantee a set cost to customers. However, we noted that Evergreen offered no quantifiable business records for the 2 years in question that would substantiate the testimony. In particular, Evergreen's tax returns for the years 1986 through 1990 failed to adequately reflect the profits and losses of the partnership. In light of this failure to provide any reliable financial data, we held that the testimony alone was insufficient to establish lost profits with reasonable certitude. In *Katskee v. Nevada Bob's Golf of Neb.*, 238 Neb. 654, 472 N.W.2d 372 (1991), we examined a situation involving the alleged breach of the obligations of a lessor to offer a right of first refusal to a lessee. In seeking damages for lost profits, the lessee offered testimony from an expert who had compared the lessee's profits at the new location with the lessee's profits at the former location. In examining this testimony, we noted that the expert assumed the only difference between the locations was square footage and that the lost profit figures were arrived at by using sales figures from a different time period. We also noted that the expert failed to study what effect other external factors, such as a change in the customer base or relevant market, may have had

on the diminution in profit figures. Without such studies, we held, the evidence concerning lost profits was too speculative and conjectural to warrant recovery.

In the instant case, World Radio offered no conclusive financial data supporting its claim for lost profits other than Northwall's composition of exhibit 180. Similar to the situation in *Katskee*, Northwall's preparation of exhibit 180 did not involve any studies as to how the relevant changes between the time periods would affect his computations. This failure leads us to conclude that exhibit 180 is speculative and conjectural as a matter of law. Thus, the district court erred in submitting the issue of lost profits to the jury.

### (ii) Loss of Value

Shahon's testimony regarding World Radio's loss of value necessarily suffers from the same infirmities. As noted above, Shahon computed the value of World Radio as of June 1, 1985, "assuming the numbers contained on Exhibit 180" had been the case. In light of our conclusion that exhibit 180 is speculative and conjectural as a matter of law, Shahon's testimony regarding loss of value fails for the same reason. Accordingly, Shahon's testimony is also insufficient to support an award of damages.

### (c) Other Damages

Remaining is the ability of World Radio to recover the accounting fees paid to Coopers & Lybrand for 1982 through 1984. The jury's verdict finding Coopers & Lybrand negligent in preparing the audit reports for World Radio during this period is undisputed. In addition, the parties stipulated that World Radio had paid fees in the amounts of $13,000, $14,000, and $15,000 for 1982, 1983, and 1984, respectively.

Although this court has not specifically addressed the issue, we believe that an accountant is not entitled to fees for preparing false financial statements. In reaching this conclusion, we adopt the rule as set out in the Court of Appeals' opinion in this case and as set out at 1 Am. Jur. 2d *Accountants* § 13 at 537 (1994):

> While minor inaccuracies in an audit or report may be overlooked, where by reason of the accountant's negligence, inaccuracies and failure to report facts of serious character appear, he or she is not entitled to compensation. And when compensation is paid to an accountant in reliance upon his or her report, it may be recovered, upon proof that through the accountant's negligence, the audit was in substance, false.

See, also, *Ryan v. Kanne*, 170 N.W.2d 395 (Iowa 1969); *Allen County Comm'rs v. Baker*, 152 Kan. 164, 102 P.2d 1006 (1940).

The evidence adduced at trial establishes that Coopers & Lybrand charged World Radio $42,000 for the preparation of inaccurate financial reports for the period of 1982 through 1984. In accordance with the rule set forth above, Coopers & Lybrand should not have been compensated for its negligent work in preparing the inaccurate reports. Thus, we conclude that World Radio is entitled to an award of $42,000.

In addition to these fees, the Court of Appeals concluded that there was sufficient evidence in the record that World Radio also paid large accounting fees to Arthur Young as a result of Coopers & Lybrand's negligence but that the jury was not properly instructed on the issue. We agree. Unlike the fees paid to Coopers & Lybrand, however, the precise amount of the fees paid to Arthur Young as a result of Coopers & Lybrand's negligence cannot be ascertained from the record before us. For that reason, this cause must be remanded on this issue.

## V. ADDITIONAL ASSIGNMENTS OF ERROR

The parties have raised numerous assignments of error involving the jury instructions tendered by the district court as well as the issue of contributory negligence. In light of our holding that World Radio failed to prove its damages for lost profits and loss of value with the required degree of certainty and reliability, we need not, and therefore decline to, address those additional assignments of error.

## VI. CONCLUSION

In summary, we conclude that the issue of proximate cause in this case involved a question of fact and was therefore properly

submitted to the jury. We hold, however, that World Radio's evidence concerning lost profits and loss of value is speculative and conjectural as a matter of law. For this reason, we affirm that portion of the Court of Appeals' decision affirming the liability verdict against Coopers & Lybrand and dismissing the damage award for lost profits and loss of value. Furthermore, we conclude that World Radio is entitled to recover the $42,000 in fees it paid to Coopers & Lybrand for negligent audits, as well as the fees World Radio paid to Arthur Young as a result of Coopers & Lybrand's negligence. Because the amount of fees paid to Arthur Young cannot be ascertained from the record, we remand this cause for determination of those fees.

AFFIRMED AS MODIFIED, AND CAUSE REMANDED
FOR FURTHER PROCEEDINGS.

LANPHIER, J., not participating in the decision.

WHITE, C.J., concurring.

I agree with the result reached by the majority; however, since the record clearly establishes that only one inference could have been drawn based on the evidence produced at trial, i.e., that the trial court should not have submitted the issue of proximate cause to the jury, I write separately.

The majority holds that "whether Coopers & Lybrand's incorrect auditing practices caused World Radio financial harm damage was a factual question for the jury" and that "the trial court correctly submitted the issue of proximate cause to the jury."

The majority relies on testimony that World Radio (WR) believed its financial status was sound (although both the chief executive officer and the chief financial officer knew of the missing payable and of the strange method used to account for that payable) and on WR's assertion that it would have corrected the problems with its internal controls had it known of those problems. The majority also relies on "other testimony . . . that Coopers & Lybrand's failure to detect the weaknesses in [WR's] internal accounting controls caused an irreparable decrease in [WR's] profits and value."

The conclusion is not justified by the evidence and is at best hopeful. An examination of the record reveals that WR, as a

business, recovered from the effects of any negligence attributable to Coopers & Lybrand (C&L). The majority opinion disregards this evidence. Although WR was unwilling to pay its new auditors the additional costs involved in constructing full financial statements for 1985, WR's creditors and other vendors continued to do business with WR. Its bank increased WR's credit line once the financial statements were reconstructed. WR continued to expand its business, opening seven new stores in 1986 and 1987 and reaching several new markets. In 1986 and 1987, WR posted pretax earnings of over $1 million, with gross sales exceeding $40 million in 1987. Significantly, WR's equity increased by over $2 million in 1986, just 1 year after the discovery of the defect in the financial statements.

Additionally, the evidence clearly shows that many factors other than C&L's actions resulted in WR's bankruptcy. After dismissing C&L in 1985, WR made significant changes in its management team, hiring a new chief financial officer and other personnel. WR's new vice president of merchandising, Malcolm Ballinger, implemented significant changes in WR's operations—he pushed for the liquidation of old, outdated inventory, reduced prices, increased sales commissions, introduced an entirely new product line in the form of extended warranty contracts, changed WR's product mix from 10 percent video and 90 percent audio to 46 percent video and 54 percent audio, and created and staffed a new inventory control board that allowed WR to operate at lower inventory levels while still achieving desired sales and profit margins. In 1986, WR began to experience significant competition in several of its markets. WR also stated during its bankruptcy proceedings that a structured buyout of all of Larry Meyerson's stock in 1988 rendered WR insolvent.

All of these changes occurred during the interim between the termination of C&L and WR's eventual bankruptcy. By WR's own admission, these *were* the factors that led to its demise. In a management memorandum dated March 29, 1988, nearly 3 years after WR dismissed C&L for failing to discover the payable, Luke Northwall and Ballinger blamed WR's financial problems on market conditions: "[WR's loss in fiscal 1988] can

be directly attributed to operating in unprofitable markets, excessive compensation for selected employees, and disagreements over strategic plans for the future. . . . The Company is a viable entity if certain markets are closed."

Although the question of proximate cause is ordinarily a determination for the jury, when, upon the evidence produced, only one inference can be drawn, it is for the court to decide whether a given act or series of acts is the proximate cause of the injury. *Starlin v. Burlington Northern, Inc.*, 193 Neb. 619, 228 N.W.2d 597 (1975). An injury that could not have been foreseen or reasonably anticipated as a probable result of the negligence is not actionable, nor is an injury that is not a natural consequence of the negligence complained of, and would not have resulted from it but for the interposition of some new, independent cause that could not have been anticipated. *Turek v. St. Elizabeth Comm. Health Ctr.*, 241 Neb. 467, 488 N.W.2d 567 (1992).

Upon the evidence produced at trial, only one inference could have been drawn—WR rebounded from any impact caused by the inaccuracies in its financial statements to generate record profits in 1986 and 1987 and to expand its business over the next several years. Five years later, WR simply fell prey to the highly competitive market in which it operated.

FAHRNBRUCH, J., joins in this concurrence.