DONALD BRISTOL, APPELLANT AND CROSS—APPELLEE, V. ERIC RASMUSSEN, APPELLEE AND CROSS—APPELLANT.

547 N.W.2d 120

Filed April 19, 1996.   No. S-94-085.

David H. Hahn, of Hahn Law Office, for appellant.

Darrell K. Stock, of Snyder & Stock, for appellee.

White, C.J., Caporale, Fahrnbruch, Lanphier, Wright, Connolly, and Gerrard, JJ.

Gerrard, J.

## I. INTRODUCTION

Plaintiff–appellant Donald Bristol appeals the judgment of the district court, which reversed a county court judgment in his favor. The county court, in a bench trial, found that the destruction of 10 acres of growing soybeans on Bristol's land was proximately caused by flooding, resulting from defendant–appellee Eric Rasmussen's downstream obstruction of Indian Creek, and awarded damages to Bristol.

Rasmussen cross–appeals the judgment of the district court, because it ostensibly lets stand the county court ruling that Rasmussen's obstruction was the proximate cause of the flooding to Bristol's land. Finding the judgment of the district court to be in error, we reverse, and remand with directions to reinstate the county court judgment.

## II. FACTUAL BACKGROUND

Bristol and his wife are the owners of the northeast quarter of Section 22, Township 8 North, Range 2 West of the 6th P.M., in Fillmore County, Nebraska. Bristol has farmed this northeast quarter section either with his father or on his own since 1977. Rasmussen is the owner of the northeast quarter of Section 15, Township 8 North, Range 2 West of the 6th P.M., in Fillmore County, Nebraska, which is located directly north of Bristol's land. Indian Creek drains south to north through both properties. The quarter sections at issue are not adjoining, but are separated by the southeast quarter of Section 15. In 1978, Bristol's father rerouted Indian Creek to flow alongside the county road which was the eastern border of his quarter section. Bristol partially filled the old creekbed and began farming this land. It is uncontroverted that this land was subject to periodic flooding. However, the evidence at trial indicated this flooding was temporary, and the floodwaters would rapidly drain from the affected land.

In 1989, after a heavy rain, Bristol noticed his land was not draining as rapidly as it had in the past. Bristol's grandfather told him he thought there appeared to be an obstruction across Indian Creek on Rasmussen's property. In response, Bristol followed the drainage of Indian Creek until, on Rasmussen's land, he encountered an obstruction across the creek which apparently was causing water to pool and not drain off his land. Bristol unsuccessfully attempted to contact Rasmussen concerning the obstruction. Instead, he met with Rasmussen's tenant. At Bristol's urging, the tenant removed the obstruction with a backhoe, and Bristol's land immediately began draining. The tenant stated he did not place the obstruction across Indian Creek, nor was he aware of the obstruction until Bristol brought it to his attention.

In early July 1990, Bristol again noticed an obstruction across Indian Creek as it passed through Rasmussen's land. At this time, Bristol contacted Rasmussen and expressed his concern that this obstruction would cause flooding on his land if they were to have a large rain. In response, Rasmussen informed Bristol that he was permitted to place the obstruction across the creek. In fact, in 1990, Rasmussen hired Joel Snodgrass of George Thompson Land Leveling to install the obstruction at issue across Indian Creek. Snodgrass stated that at Rasmussen's direction and while Rasmussen was present, he placed a used culvert of unknown size in the flow of Indian Creek and then moved some nearby soil to obstruct the remainder of the drainageway.

On July 20, 1990, Bristol reported the northeast quarter of Section 22 received 0.94 inch of rain and another 2 inches of rain on July 26. Consequently, Bristol testified that on July 26, water began backing up onto his land. Bristol documented this flooding and the condition of the land prior to the flooding on videotape and with photographs that were offered and received at trial.

At trial, only Bristol testified as to proof of damages. Bristol first identified for the court how he determined the number of acres damaged by the July 26, 1990, flooding. Using a map from the Agriculture Stabilization and Conservation Service (ASCS), Bristol explained how he and other farmers relied on

the ASCS for estimates of crop damage. Bristol then testified that based upon the ASCS estimate and his knowledge and experience in measuring his own field, it was his opinion that 15 acres of his soybeans were destroyed by the flooding of July 26.

Bristol admitted that during a period of heavy rain, his land was subject to flooding, even without an obstruction across Indian Creek. Thus, in an effort to establish the extent to which the flooding on his land was solely attributable to Rasmussen's 1990 obstruction across Indian Creek, Bristol testified that in 1992, the current crop year, even though Rasmussen was no longer obstructing Indian Creek, 5 acres of the land at issue flooded and sustained crop damage subsequent to a 5-inch rain. In contrast, Bristol testified that the 1990 flooding which occurred while Rasmussen was obstructing Indian Creek, destroyed 15 acres of soybeans subsequent to a 3-inch rain.

In testifying how he estimated the projected yield for the destroyed soybeans, Bristol testified that he relied on production records for that portion of his 1990 soybean crop which was not damaged by flooding on the same field. He also testified regarding soybean production records for the same field in 1991. Bristol concluded that the average yield for the flooded 1990 soybeans would have been 55 bushels per acre. Bristol conceded that the soybeans destroyed in 1990 were replanted short-season soybeans and that the first planting of soybeans had been destroyed by a flood following a heavy rain in June, prior to the existence of any obstruction on Rasmussen's property. Bristol admitted that a yield difference would be expected between the full-season soybeans, which yielded 55 bushels per acre, and the replanted short-season beans. However, he did not quantify this expected yield difference.

Bristol testified that he sold his 1990 crop of undamaged soybeans from the northeast quarter of Section 22 for an average price of $5.70 per bushel. Bristol testified that he saved $5 to $10 per acre in irrigation costs by not having to irrigate the 1990 destroyed soybeans. He also testified that he saved $10 per acre by not having to harvest the soybeans, as this would have been the amount he would have paid someone to harvest the field. The trial court asked Bristol if there were any further costs

saved such as herbicides or other chemicals, and he replied that no other costs were saved.

## III. FINDINGS OF COUNTY COURT

The trial court entered a money judgment for Bristol and against Rasmussen in the amount of $2,935 and made extensive findings of fact in an eight-page order. The trial court acknowledged that Bristol's evidence was substantially composed of his observations and opinions based upon his knowledge and experience in farming this quarter section for the past 16 years. The proof of negligence offered by Bristol was essentially that on only two occasions, water had failed to adequately drain from Bristol's land. On both occasions, an obstruction was in place across Indian Creek on Rasmussen's land. In addition, during the 1989 occurrence, removal of the obstruction by Rasmussen's tenant resulted in the immediate draining of the pooled water from Bristol's land.

The trial court recognized Bristol did not offer any expert testimony as to causation, nor did Rasmussen offer any expert testimony to refute Bristol's claim. However, the trial court did not find expert testimony necessary, as Bristol's testimony concerning the discovery of the obstruction, the effect after removal, and the nonexistence of any other obstructions went unrefuted. Moreover, Snodgrass' testimony revealed that Rasmussen was responsible for the obstruction and that Rasmussen did not utilize any engineering expertise in the construction of the 1990 obstruction.

The trial court found that Bristol's claim of complete destruction of the affected soybean crop went unrefuted and that the destroyed crop was unmatured. The court found Bristol to be qualified to give his opinion of the number of acres affected by the flooding. The trial court then concluded that of the 15 acres flooded in July 1990, only 10 can be attributed to Rasmussen's negligence, due to the fact 5 acres of soybeans on the same land were destroyed in the 1992 flooding when Rasmussen was not obstructing Indian Creek.

The trial court then found that the measure of damages for the destruction of the unmatured crop is the value of the crop had it matured, minus the salvage value if any, minus the costs

saved by not having to harvest and transport the crop to market. The court found that Bristol would have received $5.70 per bushel market value at harvesttime, less $20 per acre that was saved for not harvesting and transporting to market the 10 acres of destroyed soybeans.

In addition, the court found Bristol's probable yield to be 55 bushels per acre, the average yield for the soybeans not destroyed by the 1990 flooding. The court recognized that the testimony as to yield was based upon full-season soybeans and that the destroyed soybeans were short-season soybeans with a different estimated yield. However, the trial court found no other evidence existed as to any other expected yield, nor was there any evidence as to any further circumstances which would have prevented this short-season crop from maturing and being harvested. Thus, the court calculated Bristol's total damages as $2,935 and entered judgment accordingly.

## IV. DISTRICT COURT PROCEEDINGS

On appeal, the district court reversed, and remanded with instructions to dismiss. The district court made no findings as to whether the county court erred in its determination of liability in favor of Bristol and against Rasmussen. Instead, the district court, in its order of dismissal, was generally critical of Bristol's damage evidence and reversed the judgment for the following verbatim reason:

> All in all, I believe that this case should be reversed because the local fair market value of soybeans was not established by the testimony of an elevator employee or any other means, expert or lay. The law is clear that price is determined as of the day that the crop matures—harvest time. If one wants to argue, it could be said that price should be determined as of the day that the crop was injured. If one selects a day after harvest, at least more tha[n] 30 days thereafter, one has to account for storage costs. How daring it would be for this trial judge to permit a plaintiff to pick a particular date of sale at his option or even to average his sale date selections!

> I appreciate the effort to do things economically. On the other hand, cases involving small awards are often among

the most difficult both in the trying and the deciding. I would suggest that a pre-trial conference might have been worth the expense and time involved. The case is reversed and remanded with the instruction to dismiss it at the cost of Plaintiff.

## V. ASSIGNMENTS OF ERROR

Bristol assigned as error the district court's finding that the local fair market value of soybeans had not properly been established and that the price of a crop destroyed prior to harvest is determined as of the day that the crop matures.

In his cross–appeal, Rasmussen assigns as error the presumptive finding that his actions were the proximate cause of the flooding on Bristol's property.

## VI. SCOPE OF REVIEW

In our review of a bench trial in a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly wrong. *Coldwell Banker Town & Country Realty v. Johnson, ante* p. 523, 544 N.W.2d 360 (1996); *Hill v. City of Lincoln, ante* p. 88, 541 N.W.2d 655 (1996). In reviewing a judgment awarded in a bench trial, the appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Ashland State Bank v. Elkhorn Racquetball, Inc.*, 246 Neb. 411, 520 N.W.2d 189 (1994).

However, whether a decision conforms to law is by definition a question of law, in connection with which an appellate court has an obligation to reach a conclusion independent of that of the inferior court. *Roberts v. Weber & Sons, Co.*, 248 Neb. 243, 533 N.W.2d 664 (1995); *Ruch v. Conrad*, 247 Neb. 318, 526 N.W.2d 653 (1995).

## VII. ANALYSIS

### 1. Issue of Rasmussen's Negligence

The flow of water cannot be interfered with to the detriment of the upper proprietor. *Romshek v. Osantowski*, 237 Neb. 426, 466 N.W.2d 482 (1991). In Nebraska, the principle is well

established that it is the duty of those who build structures in a natural watercourse to provide for the passage through such obstruction of all waters which may reasonably be anticipated to flow or be carried therein, and this is a continuing duty. *Wilson Concrete Co. v. County of Sarpy*, 189 Neb. 312, 202 N.W.2d 597 (1972). In addition, it is the duty of one who constructs an artificial drain with structures therein changing the natural flow of surface water to use reasonable care to maintain it or them so that water will not be collected and thrown on another to his damage. *Gable v. Pathfinder Irr. Dist.*, 159 Neb. 778, 68 N.W.2d 500 (1955), *overruled on other grounds, Cover v. Platte Valley Public Power & Irr. Dist.*, 162 Neb. 146, 75 N.W.2d 661 (1956).

Thus, as a downstream proprietor, Rasmussen cannot unreasonably interfere with the flow of water to the detriment of the upper proprietor Bristol. Considering the evidence most favorably to the prevailing party, Bristol, the uncontroverted testimony of Snodgrass was that in 1990, Rasmussen directed him to install a used culvert in the natural watercourse of Indian Creek, thus creating the obstruction Bristol claimed caused the flooding of his land. Moreover, there was no evidence that Rasmussen exercised due care to prevent injury to upstream landowners when he directed Snodgrass to install the culvert across Indian Creek. Therefore, we determine that the trial court was not clearly wrong in its finding that Rasmussen breached his duty as a downstream proprietor by negligently obstructing Indian Creek.

The question then becomes whether Rasmussen's obstruction was the proximate cause of the damage to Bristol's unmatured soybeans. Bristol testified it was Rasmussen's obstruction which caused both the 1989 and 1990 flooding. In support of this claim, Bristol offered photographs and a videotape which clearly demonstrated that Rasmussen's obstruction did, in fact, create a ponding of the waters flowing into Indian Creek. Moreover, it was Bristol's unrefuted testimony that this ponding caused by Rasmussen's obstruction extended back to his property. In addition, Bristol testified that in 1989, immediate removal of the obstruction on Rasmussen's land across Indian Creek resulted in the draining away of the floodwaters from

Bristol's land. The evidence clearly supports the conclusion that Rasmussen's obstruction across Indian Creek in 1990 was the proximate cause of the flooding on Bristol's land. Accordingly, the finding of the trial court that Rasmussen was negligent and his negligence was the proximate cause of the damages suffered by Bristol is likewise not clearly wrong. There is no merit to Rasmussen's cross–appeal.

## 2. ISSUE OF PROOF OF DAMAGES

Having found that the evidence supports the conclusion Rasmussen breached his duty to Bristol and that Rasmussen's acts were the proximate cause of the damage sustained by Bristol, we now turn to the issue of whether the damages awarded Bristol were in conformance with Nebraska law. While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994). The question of whether damage based on the destruction of an unmatured crop is speculative is decided by whether there is sufficient data to determine with reasonable certainty the probable value it would have had if it had matured. *Patrick v. City of Bellevue*, 164 Neb. 196, 82 N.W.2d 274 (1957).

The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Records v. Christensen*, 246 Neb. 912, 524 N.W.2d 757 (1994); *McDonald v. Miller*, 246 Neb. 144, 518 N.W.2d 80 (1994). In awarding damages, the fact finder is not required to accept a party's evidence of damages at face value, even though that evidence is not contradicted by evidence adduced by the party against whom the judgment is to be entered. *Schuessler v. Benchmark Mktg. & Consulting*, 243 Neb. 425, 500 N.W.2d 529 (1993).

The measure of damages for the destruction of an unmatured growing crop is the value the crop would have had if it had matured, minus any savings to the plaintiff in the costs of producing, harvesting, and transporting the crop to market.

*Romshek v. Osantowski*, 237 Neb. 426, 466 N.W.2d 482 (1991). Damages based upon the value of an unmatured crop are analogous to profits lost and are governed by the same rule precluding recovery in cases of either uncertainty or remoteness. *Id.* The value of a matured crop may be proved by showing the market value, less the necessary costs of producing, harvesting, and transporting the crop to market. See *Hopper v. Elkhorn Valley Drainage District*, 108 Neb. 550, 188 N.W. 239 (1922). However, there are several factors that assist the trier of fact in determining the value of an unmatured crop at the time of its injury or destruction, including: the nature of the land; the type of crop planted; the kind of season, whether wet or dry; the yield of crops growing in such a season; the average yield of crops on neighboring land; the development of the crop at the time of destruction; the yield of a similar crop not injured; the market value of the crop as injured; the market value of the probable crop without injury; the time of the injury; the expense that would have been incurred if the crop had not been injured; the circumstances which surrounded the crop which may have resulted in the crop's not maturing; and all other circumstances illustrated by the evidence tending to establish such value. *Romshek v. Osantowski, supra* (citing *Hopper v. Elkhorn Valley Drainage District, supra*).

The trial court properly identified the measure of damages to unmatured growing crops and cited the factors to be considered from *Hopper v. Elkhorn Valley Drainage District, supra*. The court specifically identified four factors that were considered in awarding damages in this case: (1) the acres affected by Rasmussen's negligence, (2) the reasonably probable yield from those acres, (3) the market value of the crops destroyed, and (4) the cost saved by Bristol in not having to finish producing and in not having to harvest and transport the crop to market.

### (a) Acres Affected

The trial court determined that the destruction of only 10 of the 15 acres flooded was proximately caused by Rasmussen's negligence. Bristol testified that based upon his own estimates and those of the ASCS, it was his opinion 15 acres of soybeans were in fact destroyed in the 1990 flooding. The court reduced

Rasmussen's responsibility for the 1990 flooding by 5 acres because of Bristol's testimony that his land was subject to periodic flooding and that after a 5-inch rain in 1992, he experienced destruction of 5 acres of soybeans on this same land, even when Indian Creek was not obstructed.

In reversing, the district court was critical of the county court's finding based upon this testimony. The district court concluded that expert witness testimony would have better established the acres damaged by Rasmussen's negligence. The trial court is given discretion in determining whether or not a witness is qualified to state his opinion, and such determination will not be disturbed on appeal absent an abuse of discretion. *Paro v. Farm & Ranch Fertilizer*, 243 Neb. 390, 499 N.W.2d 535 (1993).

The trial court did not abuse its discretion by accepting Bristol's estimates as to the number of acres affected. Bristol testified that he relied on ASCS crop damage estimates just as other farmers in the area rely on these estimates to determine crop damage. Further, based upon Bristol's years of experience and specialized knowledge in farming that particular land, the trial court found that he qualified as an expert to testify in the form of an opinion as to the number of acres affected by the flooding. See Neb. Rev. Stat. § 27-702 (Reissue 1995). While there may be alternate methods to establish the number of acres for crop damage purposes, there was adequate foundation laid for Bristol's testimony, and his testimony was unrefuted by either cross-examination or other expert or lay testimony.

### (b) Reasonably Probable Yield

The trial court relied upon Bristol's testimony regarding the yield on the unflooded portion of the 1990 soybean crop, on the same field, in determining a reasonably probable yield for the damage calculation. In *Miller v. Drainage District*, 112 Neb. 206, 199 N.W. 28 (1924), the defendant in a crop damage case complained when the plaintiff was allowed to testify regarding the probable yield and the market value of his crop. This court determined that the plaintiff was competent to testify as to the value of his own personal property and stated: " 'In an action for damages on account of an injury to chattels, the owner of such

chattels is qualified by reason of that relationship to give his estimate of their value.' " *Id.* at 209, 199 N.W. at 29.

In the case at bar, the trial court properly applied the factors found in *Hopper v. Elkhorn Valley Drainage District*, 108 Neb. 550, 188 N.W. 239 (1922); Bristol's yield projection of 55 bushels per acre was neither speculative nor uncertain given the status of the crop at the time of injury. Rasmussen did not cross-examine Bristol regarding the probable yield, nor was any evidence offered to refute the 55-bushel-per-acre projection. The evidence regarding the probable yield, based on Bristol's testimony and the actual yield for the same field in 1990, was sufficient for the trier of fact to estimate and assess Bristol's damages with a reasonable degree of certainty and exactness.

### (c) Market Value

Bristol testified that he sold the remainder of the undamaged 1990 soybean crop for an average price of $5.70. The trial court utilized this $5.70 figure when it calculated the damages to be awarded to Bristol. Clearly, the county court used a proper measure of the "market value of the probable crop without injury" when it accepted the 1990 price received for those soybeans produced on the same quarter section of land as that of the destroyed crop.

Thus, the district court erred when it found that "local fair market value of soybeans was not established by the testimony of an elevator employee or any other means, expert or lay." Quite to the contrary, "market value of the probable crop without injury" was established by Bristol's unrefuted testimony. See *Hopper v. Elkhorn Valley Drainage District, supra.* Accordingly, we hold that an owner of crops may testify regarding the price that the owner received for crops actually sold, and such testimony is probative of fair market value if the crop sale is an arm's-length transaction. Fair market value is the price that a crop will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell. In the instant case, Bristol sold the undamaged soybeans in the open market for an average price of $5.70 per bushel. There is no evidence that this was anything other than an arm's-length transaction, and the price of the soybeans that were actually sold

is highly probative of the "market value of the probable crop without injury."

Moreover, Bristol's damages are not any more speculative or uncertain because he actually marketed portions of the 1990 soybean crop at different times and, therefore, utilized an average or mean market price. Bristol is entitled to recover the value the crop would have if it had matured, and the evidence regarding actual market price was again sufficient for the trier of fact to estimate and assess Bristol's damages with a reasonable degree of certainty and exactness.

### (d) Savings in Cost of Production and Transportation

The trial court accepted Bristol's unrefuted testimony that he saved $5 to $10 per acre irrigation costs and $10 per acre by not having to raise to maturity and harvest the soybeans destroyed in the flooding. Bristol specifically testified, in response to questions from the court, that there were no further cost savings by not having to harvest these specific soybeans.

Accordingly, when calculating damages, the trial court assessed a full $20 per acre against Bristol for production and transportation savings. We determine that there was sufficient evidence to support the trial court's findings regarding the costs saved by Bristol in not having to finish producing and in not having to harvest and transport the crop to market.

## VIII. CONCLUSION

The county court was not clearly wrong in finding that Rasmussen negligently obstructed Indian Creek and that this negligence was the proximate cause of the flooding which destroyed 10 acres of Bristol's soybean crop. Furthermore, the trial court correctly determined the measure of damages, and there was sufficient evidence to support the findings and the judgment of the county court.

It is for these reasons that we reverse the judgment of the district court and remand with directions to reinstate the county court judgment in favor of the plaintiff–appellant, Bristol, and against the defendant–appellee, Rasmussen, in the sum of $2,935. The costs of this action are taxed to Rasmussen.

REVERSED AND REMANDED WITH DIRECTIONS.