LAWRENCE PRIBIL, APPELLANT, V. BARTON AND
SANDRA KOINZAN, HUSBAND AND
WIFE, ET AL., APPELLEES.
647 N.W.2d 110

Filed June 11, 2002. No. A-01-251.

George H. Moyer, Jr., of Moyer, Moyer, Egley, Fullner & Warnemunde, for appellant.

David J. Partsch and Thomas H. DeLay, of Jewell, Collins, DeLay & Gray, for appellees Koinzans.

Kathleen Koenig Rockey, of Copple & Rockey, P.C., for appellees Held and Shaw.

IRWIN, Chief Judge, and HANNON and INBODY, Judges.

HANNON, Judge.

## INTRODUCTION

Lawrence Pribil sued Barton and Sandra Koinzan, Terry Held, and Genevieve Shaw (collectively the defendants) for damages that the Koinzans' cattle did to Pribil's mature corn and soybean crops on several quarters of irrigated land. The Koinzans' cattle escaped from Shaw's land and went onto Pribil's neighboring

fields. A summary judgment on the issue of liability was granted, and liability is not disputed in this appeal. In Pribil's operative petition, he sought $164,079.42 in damages, but the jury returned a verdict for only $34,920.60. Pribil alleges that the trial court erred in sustaining the defendants' objection to the admission of evidence of an alleged agreement made by a representative of the Koinzans during settlement negotiations with Pribil on the corn and soybean yields he would have had without damage from the cattle, as well as the price of corn per bushel. Pribil also alleges error by the court in instructing the jury that Pribil must prove the damages to his crops to a "reasonable certainty." We conclude that the alleged partial settlement was inadmissible under Neb. Evid. R. 408, Neb. Rev. Stat. § 27-408 (Reissue 1995), and that the complained about jury instruction has been specifically approved by the Nebraska Supreme Court. Accordingly, we affirm.

## SUMMARY OF EVIDENCE AND ISSUES

Pribil is a 70-year-old farmer with many years' experience growing corn and soybeans on irrigated land southwest of O'Neill, Nebraska. The land is irrigated by center-pivot irrigation systems. These systems work by pivoting a suspended pipe with sprinklers on it around the center of a quarter, which is usually 160 acres. Thus each system irrigates only about 130 acres of each quarter section. The irrigated portion of each quarter section is often called a "circle." In 1996, Pribil raised corn and soybeans on 13 circles. The cattle trespassed upon only five circles that were adjacent to Shaw's land and to each other. It is undisputed that between September 23 or 25 and the end of October, cattle for which the defendants were legally responsible escaped and got into and damaged the corn and soybeans on these five circles.

The evidence contains a thorough history of the dates and times the cattle got into Pribil's crops as well as the damage to these crops by the cattle or by those trying to get the cattle out of the fields. The trial court determined the defendants were liable as a matter of law for the damage those cattle did to Pribil's crop. The issues litigated concerned the physical damages the cattle did, the effect of that damage upon the yield of these circles, and the market value of that lost crop.

Pribil testified to the history of his farming of these circles, the yield history of each circle, and the details of his farming on each of the circles in 1996. The testimony included such things as the type of crop planted, when and how fertilizer and herbicide were applied, the farming practices used, and the appearance of the crop. This evidence appeared to show every imaginable variable that might affect the yield and quality of the corn and soybeans that year, as well as the market value. Similarly, he testified in detail about the physical damage the cattle did to his corn and soybean fields by their trespassing. Obviously, he did this in order to establish a basis for his opinion and the opinions of other qualified farmers in the area of what would have been harvested from these circles had they not been damaged by the trespassing cattle. Pribil then testified to the yield he did in fact receive. Since Pribil and other farmers did testify about such matters, and there is no error assigned by any party concerning the foundation for such evidence or the sufficiency of that evidence to support the verdict, we see no point in summarizing this voluminous evidence. We do so only to the extent necessary to give a setting to the issues appealed. This is not to say that the defendants did not dispute Pribil's case on damages on almost every issue.

The cattle belonged to the Koinzans. Shaw owned the land from which the cattle escaped. She rented it to the Koinzans from May to October 1996, and Held managed the Shaw property. Prior to trial, the court granted Pribil a partial summary judgment determining that all defendants were liable for the damage done by the Koinzans' cattle, and that determination is not disputed in this appeal.

Tom Chambers was an adjuster representing an insurance carrier that was in some way liable for the damages Pribil suffered as a result of the trespassing cattle. In order to avoid raising issues concerning the existence of liability insurance, the parties stipulated that Chambers would be described as a "representative" of the Koinzans. Pribil and Chambers had conversations during the fall of 1996 concerning the loss Pribil suffered from the trespass. Some statements made by Chambers during those conversations were admitted, but some of his statements were excluded upon the defendants' objections. The exclusion of this

evidence is one of the issues in this appeal. The background and details will be set forth when we consider that issue.

While the evidence on the amount of damages is not directly relevant to the issues of the appeal, a summary might be helpful to understand the issues. Pribil's evidence, if accepted, would have shown he lost 26,311 bushels of corn and 2,153 bushels of soybeans from the cattle's trespass. The value of the loss of yield is another variable, but the evidence would support a market value of approximately $2.75 per bushel for the corn and more than $5 for the soybeans. Thus, the evidence would have supported a verdict of approximately $83,000. The jury returned a verdict for Pribil in the amount of $34,920.60, and Pribil appealed.

## ASSIGNMENTS OF ERROR

Pribil assigns as error the trial court's (1) refusing to allow the hearsay testimony of Tom Chambers, a representative of the Koinzans; (2) including jury instruction No. 8C; and (3) overruling Pribil's motion for new trial.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is a factor only when the rules make such discretion a factor in determining admissibility. *Snyder v. EMCASCO Ins. Co.*, 259 Neb. 621, 611 N.W.2d 409 (2000). We find that in *First Nat. Bank in Mitchell v. Kurtz*, 232 Neb. 254, 440 N.W.2d 432 (1989), the Nebraska Supreme Court reviewed, under the abuse of discretion standard, a ruling excluding evidence under rule 408. That case, however, was decided before *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991), when the Nebraska Supreme Court clearly stated that the abuse of discretion standard applies only when discretion is a factor of admissibility. We find no suggestion in the Nebraska Evidence Rules that discretion is an element of admissibility under rule 408. " '[I]f a statement violates the rule, a trial court does not have discretion to admit the statement.' " David P. Leonard, The New Wigmore: Selected Rules of Limited Admissibility § 3.2.3 at 295 (2002), quoting *C.J. Duffey Paper Co. v. Reger*, 588 N.W.2d 519 (Minn. App. 1999). Upon the basis

of that authority and our own reasoning, we conclude that rule 408 is an exclusionary rule and not a rule of discretion.

■ Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001).

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Snyder, supra.*

## ANALYSIS
*Exclusion of Tom Chambers' Statements.*

After the Koinzans' cattle were removed from the area near Pribil's land, Chambers and Pribil talked on the telephone and then met by agreement at a restaurant in O'Neill. The parties stipulated that Chambers was a representative of the Koinzans, but not of Shaw or Held. The court therefore allowed some of the testimony of what Chambers said to Pribil into evidence as an admission against the Koinzans, but not as against Held and Shaw, and the jury was so instructed during some of Pribil's earlier testimony of Chambers' statements.

Pribil testified that at that meeting he gave Chambers the weights that showed how much corn he had harvested from the southeast quarter of section 15, which had been picked. Chambers wanted to know if there was any way the corn could be harvested and taken to town and weighed. Pribil told him that all his corn goes into his bins. Pribil testified that Chambers asked for sample weights and that Pribil "said that I'd agree to go ahead and pick the North Half of the South Quarter that was so heavily damaged, and I would weigh that, but it would also go to the bins, and that's what I did." Pribil then testified that he "wasn't about to weigh it all," and he explained that by using bin measurements with the test weight of the corn and the moisture of the corn, he could come close to a correct determination of the amount of corn in a bin.

The court ultimately instructed the jury that Pribil was entitled to recover "the market value the crop would have had at maturity, if it had not been injured . . . minus any market value

of the injured crop, and . . . minus any savings to the plaintiff in the cost of production and transportation to market." Under the evidence in this case, the market value would necessarily be determined by the per bushel market value of corn and soybeans at the applicable time. The other element of damage would be the difference between what Pribil would have raised on this land minus the amount he did raise. In summarizing the evidence and argument, we are going to use the term "projected yield" to mean the amount of corn or soybeans per acre that the land would have produced in 1996 if the Koinzans' cattle had not trespassed on Pribil's fields and the term "actual yield" to be corn and soybean amounts that were actually harvested from the land in 1996. Except for a possible agreement between Pribil and Chambers in their meeting in O'Neill, both the projected yields and the actual yields were disputed. The evidence shows that the corn did not all mature on a given day and that the price of corn in late 1996 and early 1997 was not static.

Pribil testified that in the meeting in O'Neill, he and Chambers discussed the projected yields of the damaged fields. Pribil's attorney then asked, "And what did you say, and what did he say?" Counsel for Shaw and Held objected on the ground of hearsay. The court sustained the objection as to Chambers' statements, but not as to Pribil's statements. Pribil's counsel asked to make an offer of proof, and the judge stated that he could do so at the next break. The examination of Chambers continued. Pribil testified that he told Chambers what he had harvested and that Chambers asked if he could inspect the fields. Chambers also asked for a photocopy of the page of a calendar upon which Pribil had written his projected yields and the yield he had lost. This document does not have the actual yield, and indeed the evidence is that some of the corn had not been harvested at the time of the meeting. The page was finally marked exhibit 45 and admitted into evidence. The several figures on that exhibit show Pribil computed his lost yield to be 26,311 bushels of corn and 2,153 bushels of soybeans. These are the figures for lost yield which we used to compute the value of the loss that we concluded in our summary above the evidence would support.

Pribil's counsel then referred to the words "Average 135 bushels" written near the top of exhibit 45. The exhibit actually

contains a handwritten notation that is illegible, but probably is the abbreviation for average, followed by "135 bu." Pribil was then asked to explain those words. He testified, "The figure 135 is what we agreed on that it should have yielded, or that is an estimated yield of what it would have done, had there not been cattle in the corn." An objection was made and sustained. Pribil was allowed to testify that 135 is the bushel amount that the corn would have yielded, without using the word "agreed." In essence, Pribil was allowed to testify that "we estimated that it would do [yield] 155 [bushels]." Chambers wanted to deduct for moisture which would bring the estimated yield down to 135 bushels per acre. Pribil also testified that he and Chambers discussed a price of $2.75 per bushel for corn and that Pribil agreed to that price. Pribil testified that he next talked to Chambers over the telephone in February 1997 about whether the parties were going to "settle this." Pribil was asked what he had said and what Chambers had said, and an objection was made and sustained.

Later at the next break, Pribil's counsel was given an opportunity to make an offer of proof based on an earlier objection. Pribil's counsel did so by a statement. It does not appear that there was any dispute on what the offer of proof contained. We therefore summarize it as follows: Pribil offered to prove that during Pribil and Chambers' meeting in the restaurant in O'Neill, Chambers requested that Pribil's projected yield be reduced for moisture. Pribil said he would reduce it to 135 bushels per acre, and Chamber agreed that the defendants would pay on the basis of 135 bushels per acre for lost corn. It was also stated that Chambers told Pribil that Chambers would pay $2.75 per bushel for the corn. The defendants objected to the offer of proof upon the basis of hearsay and settlement negotiations.

Pribil's counsel then argued that if the defendants are jointly and severally liable, the statements are not hearsay to any of the defendants, and that Pribil was testifying about a conversation that goes beyond settlement negotiations and is an agreement. He argued that Pribil and Chambers had agreed on the yield that Pribil would have received if the crop had not been damaged by the cattle, apparently 135 bushels per acre, and that they had agreed the price he would have received for that corn was $2.75 per bushel. Counsel admitted that Pribil and Chambers still had

not agreed upon the amount of the loss, but only on the projected yield and the price.

The trial judge stated that he had concluded that the testimony was hearsay as to Held and Shaw, but not as to the Koinzans, but since the defendants were jointly and severally liable, there was no way to separate the interests of the defendants for the jury. The judge stated that consequently, the issue becomes one of unfair prejudice as to "the Koinzans" even if the issue was not expressly raised on the offer of proof. He stated that he considered the issue under rule 408 and Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995). He ruled that the statements made in the offer of proof were inadmissible under rule 408 and that rule 403 would also apply.

We have some difficulty determining what evidence of an agreement the offer of proof contained that was not already before the jury in a different form. If the substance of disputed testimony has been placed before the jury, the exclusion of it does not affect a substantial right. See *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). We do not rest our decision on that point, because it was not argued by the defendants in either this court or the trial court and because Pribil seems to be resting his position upon the refusal of the court to allow proof of an agreement, not just statements which Pribil testified that Chambers had made.

Neither party argues any issue concerning whether the evidence was excludable as hearsay, and in view of the court's ruling, we need not consider whether the offer excluded was hearsay. The court also referred to rule 403, which allows the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." It may well be that the judge thought, as we are inclined to believe, that substantially all of the information contained in the offer was already before the jury, but he did not say so. The defendants did not object upon the basis of rule 403, and the parties do not argue this issue. Therefore, we do not consider it and limit our consideration to the admissibility of the evidence under rule 408.

Pribil argues in his brief that by initially objecting on the basis of only hearsay, the defendants waived the right to object on the basis of rule 408. In support of that position, Pribil cites 12 Fed. Proc. L. Ed. § 33-228 (1988). That authority does make that statement, but the case it cites as authority, *Esco Corp. v. United States*, 750 F.2d 1466 (9th Cir. 1985), involved a situation where the hearsay objection was made at trial and the rule 408 objection was first made upon appeal. Naturally, the rule 408 objection was held to be untimely under Neb. Evid. R. 103, Neb. Rev. Stat. § 27-103 (Reissue 1995). Rule 103 requires that for error to be predicated upon a ruling excluding evidence, the "substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked." Interestingly, rule 103 requires a "timely objection" only to predicate error on the admission of evidence. In considering the need for a timely objection, one authority states: "If an issue was actually considered by the trial court, it may be considered on appeal." 4 C.J.S. *Appeal and Error* § 213 at 293 (1993). We are inclined to believe that an objection that successfully excludes evidence must be timely in the sense that it must be made so that the other party has an opportunity to make a proper offer of proof or otherwise to preserve the issue for appeal, but we find no discussion of the issue in the cases. The record shows that Pribil's counsel had a full and complete opportunity to make an offer of proof at the next break, he did make an offer, and the court ruled upon the offer upon the basis of rule 408. We do not believe a waiver arose in that situation.

Rule 408 states:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered

for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

In Pribil's brief, he recognizes that rule 408 requires the exclusion of conduct or statements made in a compromise negotiation, that public policy favors settlements, and that rule 408 encourages this by making it unnecessary for parties to avoid making admissions during compromise negotiations by making offers hypothetical. Nevertheless, Pribil cites to *O'Hare v. Peterson*, 150 Neb. 151, 33 N.W.2d 566 (1948), which allowed into evidence as an admission a check and a statement tendered with it during negotiations, even though it was tendered as a basis for settlement. This case is inapplicable because it was decided before the adoption of the Nebraska Evidence Rules in 1975. Before that date, the Nebraska rule was that admissions of fact made during settlement negotiations were admissible even if they were made during settlement negotiations if they were not made in hypothetical form. See *Brown v. Hyslop*, 153 Neb. 669, 45 N.W.2d 743 (1951).

Pribil also argues that the offer would establish that Pribil and Chambers actually agreed on the projected corn yield and the applicable price of corn. Pribil cites and quotes 2 McCormick on Evidence § 266 at 187 (John W. Strong 5th ed. 1999):

> If an offer of compromise is accepted and a contract is thus created, the party aggrieved may sue on the contract and obviously may prove the offer and acceptance. Moreover, if after such a contract is made and the offering party repudiates it, the other may elect to sue on the original cause of action and here again the repudiating party may not claim privilege against proof of the compromise. The shield of privilege does not extend to the protection of those who repudiate the agreements, which the privilege is designed to encourage.

In this case, Pribil did not sue on what he claimed to be the compromise agreement, but, rather, on the original cause of action. We note McCormick does not purport to deal with a settlement or compromise of elements of a controversy, but simply refers to a compromise that results in a contract, after an offer and acceptance. McCormick refers to a suit on the original cause

of action when the other party repudiates the compromise reached. This language necessarily assumes McCormick was considering a compromise of the entire controversy because it settles the original cause of action, not to merely some element of it. We have succeeded in finding only two of the three cases cited by McCormick in support of the above-quoted material. See, *Union Trust Co. v. Resisto Mfg. Co.*, 169 Md. 381, 181 A. 726 (1935) (involved agreement on one issue of controversy, but court rested its decision in part on no longer recognized rule that admission of facts during compromise negotiation were admissible); *Reese v. McVittie*, 119 Colo. 29, 200 P.2d 390 (1948) (involved complete settlement of controversy, not agreement on particular element). These cases were decided long before rule 408 was adopted, and therefore are not helpful. After considerable research, we have been unable to find any case decided under rule 408 which considers the admissibility of an agreement by the parties during a settlement negotiation where less than all of the disputed elements were agreed upon.

We find authority that recognizes that "[p]arties may settle any part of a controversy and leave the rest for litigation. Thus, a compromise and settlement of litigation need not embrace all the matters in issue; adjustment of single issues, although not necessarily determinative of the outcome, should be encouraged." 15A C.J.S. *Compromise and Settlement* § 3 at 177 (1967).

However, rule 408 excludes not only offers to compromise or offers made in attempting to compromise a claim which is disputed, but also excludes "[e]vidence of conduct or statements made in compromise negotiations." By its nature, negotiations are usually conducted by the negotiators discussing separate elements of a controversy that involves several disputed elements. It seems difficult to conceive how intelligent negotiation could be conducted otherwise. Usually, tentative agreements have to be made on certain elements as the discussion progresses. To the extent possible in such negotiations, when the parties can agree on one or more element, they do so. They are not likely to expressly state that agreements on the various elements are conditioned upon their being able to agree on other elements which they are about to discuss. Such preliminary agreements are not essentially different from statements made during negotiations, and in fact,

they are frequently made by way of an admission or a statement during the course of the negotiations. We think that generally, the notion that such agreements are conditioned upon being able to agree on all other points is understood but not spoken. In complex settlement negotiations, in the absence of an express provision that preliminary agreements are contingent upon full settlement of the issues being negotiated, such preliminary agreements on one or more of the disputed points should be treated like an offer of compromise or admission under rule 408.

In the case at hand, Pribil alleged in his operative petition that he had a projected yield of 84,360 bushels of corn but an actual yield of only 29,956 bushels and that corn had a market value of $2.70 per bushel, not the $2.75 that he claims Chambers agreed to. In a sense, if there was an agreement, Pribil abandoned it by not pleading it. Even though Pribil's counsel states in the offer of proof that Chambers and Pribil "agreed" upon these things, the only offered evidence of such an agreement was Pribil's conclusion. It would seem that if Pribil wanted to base his damages in part upon an agreement that was reached, he should have alleged the agreement in his petition; otherwise, his claim of such an agreement amounts to nothing but an attempt to avoid rule 408. We agree with the trial court that the offered evidence was not admissible.

*Jury Instructions.*

Pribil argues that the trial court erred in giving jury instruction No. 8C. This part of instruction No. 8 deals with Pribil's burden to prove the damages he claimed. The instructions on the issues of the burden of proof and damages necessary to understand this issue are as follows:

Instruction No. 6 sets forth Pribil's claim, and since the court established liability as a matter of law, it deals with damages. Subpart A(3) of that instruction states: "BURDEN OF PROOF: Before the plaintiff can recover against the defendants on the plaintiff's claim, the plaintiff must prove, by the greater weight of the evidence, the nature and extent of the damage to the corn and soybean crops." Instruction No. 6 also tells the jury the effect of its findings in the event it finds Pribil has met his burden, as well as if he has not.

Instruction No. 7 states the burden of proof as follows:

A. Any party who has the burden of proving a claim must do so by the greater weight of the evidence.

(1) The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true. It does not necessarily mean the greater number of witnesses or exhibits.

(2) Any party is entitled to the benefit of any evidence tending to establish a claim, even though such evidence was introduced by another.

(3) If the evidence upon a claim is evenly balanced, or if it weighs in favor of the other party, then the burden of proof has not been met.

Instruction No. 8A tells the jury how it should determine damages. It essentially instructs the jury to award damages based on the market value of the crops Pribil lost. Instruction No. 8B tells the jury several things it can consider in determining that market value. There is no claim that parts A and B of instruction No. 8 are incorrect. Instruction No. 8C is the part Pribil claims is incorrect, and it states: "The evidence must establish the amount of any item of damage with reasonable certainty or that item of damage cannot be recovered."

At the jury instruction conference, Pribil objected to the court's use of the words "reasonable certainty" in instruction No. 8C, and that issue was clearly preserved for consideration as part of this appeal. On appeal, Pribil bases his argument on several cases, none of which directly consider the correctness of a jury instruction similar to the "reasonable certainty" standard contained in instruction No. 8C. Pribil relies upon and quotes a statement in *Frank H. Gibson, Inc. v. Omaha Coffee Co.*, 179 Neb. 169, 137 N.W.2d 701 (1965). In that case, a previous decision of that court denying the plaintiff recovery after obtaining a jury verdict was reversed on rehearing because that court concluded that a jury verdict for the plaintiff was supported by sufficient evidence of causation and damages. Pribil quotes a statement from that case as follows:

If we were to follow defendants' argument to its ultimate conclusion, we would require a much higher degree of certainty for damages than for other elements in the

action. Juries are allowed to act upon inferential and probable as well as direct and positive proof. . . .

In many types of tort actions it may be said to be impossible to determine damages with exactitude and precision. Here, good will was not susceptible of exact pecuniary measurement. All that was required was that it be proved that damage resulted, and that sufficient evidence be adduced to enable the jury to make the most intelligible and accurate estimate which the nature of the case will permit.

*Id.* at 186, 137 N.W.2d at 711-12.

We think Pribil left out of the above quote a very significant part that was contained where the ellipsis appears. The excluded part was: "In Tarry v. Johnston, 114 Neb. 496, 208 N.W. 615 [(1926)], we said: 'In an action at law for the loss of good will, the evidence must contain sufficient data to enable a jury, with a reasonable degree of certainty and exactness, to *estimate* the actual damages.' (Emphasis supplied.)" *Frank H. Gibson, Inc.*, 179 Neb. at 186, 137 N.W.2d at 711-12. The *Frank H. Gibson, Inc.* case does not support Pribil's position.

Pribil also cites the introduction to NJI2d Civ. ch. 4 to the effect that the "reasonable certainty" standard is applied only by the trier of law, that is the court, and not by the trier of fact, the jury. He also argues that instruction No. 8C changed the burden of the plaintiff's proof and rendered the instructions internally contradictory. In effect, he argues that the reasonable certainty standard contradicts the burden of proof instruction. Pribil also cites various cases to be support for his argument, such as *Bristol v. Rasmussen*, 249 Neb. 854, 547 N.W.2d 120 (1996) (bench trial where amount of damages for crops was at issue), and *Lis v. Moser Well Drilling & Serv.*, 221 Neb. 349, 377 N.W.2d 98 (1985) (bench trial where it was held one seeking recovery in contract action has burden of proving damages with as much certainty as case permits). The cases did not involve jury trials and thus are not very helpful to a resolution of this issue.

We believe that *Worth v. Schillereff*, 233 Neb. 628, 447 N.W.2d 480 (1989), is the case which controls the issue presented by instruction No. 8C. *Worth* was a suit for personal injuries sustained in an automobile accident. The plaintiff sought special and general damages, including future damages, as well as damages

for loss to his wife of his services and consortium. The court instructed the jury that future damages must be " 'reasonably certain.' " *Id.* at 630, 447 N.W.2d at 482. The plaintiff appealed, arguing that the trial court erred in so instructing the jury " 'when the standard which has been recognized in this state since 1981 is "reasonably probable".' " *Id.* at 630, 447 N.W.2d at 483. The plaintiff in *Worth* argued essentially the same point as Pribil argues in this case.

In addition, in holding that an instruction almost identical to the one given by the trial court in this case in instruction No. 8C was not error, the *Worth* court stated: "This court has said that 'reasonable certainty' and 'reasonable probability' are one and the same thing." 233 Neb. at 633, 447 N.W.2d at 484, citing *Lane v. State Farm Mut. Automobile Ins. Co.*, 209 Neb. 396, 308 N.W.2d 503 (1981). With this statement and holding by the Nebraska Supreme Court, we conclude there is nothing further to discuss. We believe the *Worth* court clearly held that "reasonable certainty" and "reasonable probability" mean the same thing and that it is not error for a trial court to instruct that damages must be proved by the plaintiff with reasonable certainty, notwithstanding that the plaintiff's burden of proof is by the greater weight of evidence.

*Motion for New Trial.*

The issues raised by the motion for new trial were the same as those discussed above and therefore will not be reconsidered. There was no abuse of discretion in overruling Pribil's motion for new trial.

## CONCLUSION

Because Chambers' statements related to offers to negotiate or compromise and are therefore inadmissible under rule 408, we find that issue to be without merit. Likewise, because the Nebraska Supreme Court has decided that giving a jury instruction asking the jury to determine "reasonable certainty" is not error, we find Pribil's assignment of error on that issue to be without merit. We therefore affirm.

AFFIRMED.